**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **KYLE A. SACCENTO,** | Civil Action No. 2:23-CV-22889  (     ) |
| Plaintiff, | |
| -vs- | |
| **THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,** | **COMPLAINT** |
| Defendant. | |

Plaintiff Kyle A. Lopez, by way of Complaint against defendant The Prudential Insurance Company of America (hereinafter, "Prudential") alleges as follows:

<u>**NATURE OF ACTION**</u>

1.      This is a claim seeking an award of long-term disability benefits (hereinafter, "LTD benefits") to Kyle A. Saccento (hereinafter "Mr. Saccento") under the terms of the Broadridge Financial Solutions long term disability group policy (hereinafter "Plan" or "Policy"), providing long-term disability benefits to employees of Broadridge Financial Solutions, Inc.

2.      The Plan was underwritten, issued, and administered by defendant Prudential.

3.      The Plan is an ERISA-covered employee benefits plan that includes, among others, LTD benefits.

4.      At all times relevant, Mr. Saccento was a vested participant in the Plan, pursuant to the Employment Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 et seq., (hereinafter, "ERISA"), because Mr. Saccento was an employee of Broadridge Financial Solutions, Inc. and covered by the Policy at the time of his disability.

5.      Mr. Saccento brings this action against Prudential for denying his claim for long term disability benefits by letter dated January 11, 2022.

6.      Prudential was and is fully aware of Mr. Saccento's long-standing medical conditions that entitle him to LTD benefits, but, in breach of the Plan, denied his claim for LTD benefits.

7.      Defendant willfully and unreasonably denied Mr. Saccento's benefits without justification and without granting him a full and fair review of his claim for benefits.

8.      Defendant failed to provide a reasonable claims procedure that would yield a decision on the merits of his claim.

9.      Defendant conducted a biased review of the claim which led to the denial of benefits due.

10.     Defendant conducted an improper review, which violated ERISA and Prudential's own claims procedures, with the intent of furthering its financial interests.

11.     Defendant failed to discharge its discretionary claims processing duties solely in the interests of Mr. Saccento, the Plan participant and beneficiary.

12.     By this action, Mr. Saccento seeks to (i) recover past benefits owed to him, plus interest as provided by ERISA; (ii) obtain reinstatement of disability benefits under the Plan for so long as he submits proof of ongoing disability; (iii) obtain life insurance coverage to which he would be entitled while receiving disability benefits under the Plan; and (iv) recover attorneys' fees pursuant to 29 U.S.C. § 1132(g), ERISA § 502(g).

## GENERAL ALLEGATIONS

### JURISDICTION AND VENUE

13. Mr. Saccento's claim relates to an "employee welfare benefit plan" as defined by ERISA, and constitutes a "plan" under ERISA. This Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e) and (f).

14. Venue is proper under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391 because an action may be brought in the district where a defendant resides or may be found. Prudential may be found in the District of New Jersey at, *inter alia*, 745 Broad Street, Newark, N.J. 07102, and because it is licensed to transact the business of insurance by the New Jersey Department of Insurance, and in accordance with said license, transacts the business of insurance in the State of New Jersey. Venue is also proper in that there were sufficient contacts in this District by Defendant including the marketing, selling and issuance of the subject policy of insurance as well as frequent contacts with the Plaintiff herein.

### ADMINISTRATIVE REMEDIES

15. Plaintiff exhausted all administrative remedies under the Plan claims procedure.

### PARTIES

16. Plaintiff Kyle A. Saccento is in the health and welfare plan, whereby Prudential issued a group policy of insurance to Broadridge Financial Services.

17. The Policy, at all times pertinent hereto, was underwritten and administered by Prudential, which is a corporation engaged in marketing, selling, and issuance of insurance policies in the State of New Jersey.

18. The Plan is a fully insured "employee welfare benefit plan" as defined by ERISA, 29 U.S.C. § 1002(1), and may be sued under ERISA as an entity pursuant to 29 U.S.C. § 1132(d)(1).

19.     Defendant Prudential is a corporation licensed by the New Jersey Department of Insurance to transact the business of insurance.  Pursuant to said license, Prudential transacts the business of insurance in the State of New Jersey.  Prudential insures and underwrites the Plan under which Plaintiff has brought his claim.

20.     At all relevant times, Prudential exercised authority and control over the payment of LTD benefits and was a fiduciary of the Plan within the meaning of 29 U.S.C. § 1002(21)(A).

21.     Employees of Prudential administered, negotiated, funded, interpreted, and maintained the Plan pursuant to which Plaintiff is entitled to benefits.

22.     Prudential employees processed the claims of the Plan and made determinations.

## CLAIM FOR BENEFITS

### A.     LTD Benefits Were Wrongfully Denied:

23.     At the time of his disability, Mr. Saccento was a 35-year man who was working a full-time position with Broadridge Financial Solutions in the area of Facilities Lead/Property Management until July 10, 2021.

24.     On July 10, 2021 Mr. Saccento was forced to stop working due to widespread muscle and joint pain, fatigue, headaches, weakness, left hip pain with a labral tear, back pain, right shoulder pain with impingement syndrome, degenerative joint disease, Lyme Disease, polyarthralgia, polymyalgia, chronic pain syndrome,  medication related fatigue, pain  in the hands, knees and ankles, cognitive problems, facial weakness, numbness/tingling, 8 out of 10 pain in the neck, knees and shoulders, brain fog, dizziness, pneumonia and chronic pain syndrome.

25.     All these health conditions are discussed by Mr. Saccento's treating physicians in

their medical records and Prudential Insurance claim file substantiates these issues.

26. The January 11, 2022 denial letter stated that, in the opinion of the reviewers at Prudential, Mr. Saccento's job was sedentary in nature and the vocational department at Prudential determined that he was perfectly able to perform all of the functions of his position in his medical condition.

27. When Prudential was notified by Mr. Saccento that he intended to appeal this decision, the case was sent to Dr. Benjamin Kretzmann, a rheumatologist, to review the case from the medical point of view.

28. In his report, dated March 25, 2022, Dr. Kretzmann chronicled all of the medical issues, findings and treatment. Despite having done so, Dr. Kretzmann concluded that Mr. Saccento has zero restrictions or limitations from his medical/physical issues from July 10, 2021 to the date of the letter. In other words, Dr. Kretzmann literally disregarded the objective medical evidence and there is absolutely nothing to support his baseless conclusion.

RESUME EDITING HERE….

29. Mr. Saccento's last day of work was July 10 2021, at which time he became Disabled due to an increasing amount of serious medical issues arising from Lyme Disease, with which he had been diagnosed two years earlier, including multiple joint pain, muscle pain, vertigo and fatigue.

30. These debilitation issues were exacerbated in March and April of 2021 and the medical records show that Mr. Saccento was suffering from lower back, hand, knee and ankle pain, all of which are the hallmarks of Lyme Disease.

31. On June 1, 2021, Mr. Saccento visited with Dr. Chana Zablocki, and at this time, he was still working and trying to get through the pain and stiffness in his joints as well as he

could.

32. By July 1, 2021, Mr. Saccento was in fact working, but his health issues were deteriorating to such an extent that it was clear that this problem was going to prevent him from working in the near future.

33. At a medical visit on August 17, 2021, Mr. Saccento was in such poor physical condition that he had been forced to stop working on July 10, 2021. This visit was with Dr. Cardamore via a referral from Dr. Zablocki, and the offices notes show that Mr. Saccento was being seen for suspected chronic Lyme Disease for evaluation for diffuse point pain.

34. The doctor took a history regarding this issue and learned that the pain had been progressing over a few years. Dr. Cardamore noted that there was no significant relief of the pain and that the pain was constant with aching and burning and that the pain was exacerbated by movement. Sitting in the doctor's office Mr. Saccento rated his pain at 7 out of 10. The assessment by Dr. Cardamore was that Mr. Saccento was suffering from Lyme arthritis and the doctor recommended ways to attempt to alleviate the pain.

35. For the next visit on September 20, 2021, Dr. Zablocki stated that the prescriptions given at the previous visit with Dr. Cardamore had not been of assistance in reducing the pain Mr. Saccento was experiencing. While the physical examination of Mr. Saccento was within the normal range, that was not the crux of the problem. The problem was 7 out of 10 pain in his joints from Lyme Disease. With that high level of pain, no one could possibly work at a full-time job. Dr. Cardamore wrote that Mr. Saccento had seen numerous physicians over the years for his Lyme issues but nothing that was recommended helped with his issues. At this visit he remained with achiness, fatigue and left hip pain. He was taking medication for his pain, but there was no improvement found. In fact, at this time, the doctor

wrote that Mr. Saccento had difficulty even getting out of bed in the morning. Dr. Cardamore listed the multiple medical issues that were present with Mr. Saccento, and they included Lyme arthritis, low back pain, left hip pain which had failed 6 weeks of physical therapy, fatigue, and articular cartilage disorder of the hip.

36. During the next visit on October 4, 2021, an intra-articular steroid injection of the left hip was performed. This was done in an attempt to reduce the pain in that hip which was disabling.

37. Mr. Saccento returned to see Dr. Cardamone on October 19, 2021. At that time, he continued with chronic fatigue and pain. He had seen numerous physicians for pain relief due to Lyme in the past without success. The left hip injection had helped his pain in that area at first but now the relief was wearing off. He was also trying a diet to reduce inflammation in attempt to alleviate the Lyme issues. He also was going to see Dr. Max DeShaw, for his chronic Lyme issues.

38. During the next visit was on November 2, 2021, Mr. Saccento saw Dr. David Loya for a follow-up for is left hip pain. Dr. Loya noted that Mr. Saccento had recently begun physical therapy for his hip and that a scope might be necessary in the future.

39. The next visit was on November 22, 2021, and Dr. Zablocki wrote, that Mr. Saccento was attempting to deal with his right shoulder pain via physical therapy and an anti-inflammatory diet. He also was trying new medications, Cymbalta and naltrexone, but he was experiencing even more daytime fatigue. Dr. Zablocki ended her evaluation by stating, "He has made very little progress so disability will need to be extended."

40. The next medical encounter was on December 1, 2021, and Dr. DeShaw noted a history of years' worth of treatment for the Lyme Disease, and stated that Mr. Saccento

continues to have the following symptoms: cognitive problems, facial weakness, joint pain/swelling, muscle pain/weakness with numbness and tingling, pain in the knees, neck and should at that time was constant and was at a level of 8 out of 10. Mr. Saccento was suffering from brain fog and joint pain since 2016.

41. Mr. Saccento had two more visits with Dr. DeShaw, one on January 3, 2022, and the last on February 28, 2022. The health issues with Mr. Saccento remain the same; that is, he has cognitive issues, diffuse and debilitating joint pain, back, hip and shoulder pain and headaches.

42. As per the February 28, 2022 note, Mr. Saccento was taking IDN and Cymbalta, underwent an MRI of his spine revealed a disc herniation at L5-S1 and an MRI of his brain which showed enhancement of the seventh and eighth nerves. Additionally, some of the testing that was ordered by Dr. DeShaw Mr. Saccento was found to be suffering from Mycoplasma pneumonia and was in need of a four-week course of two antibiotics. Importantly, Dr. DeShaw described Mr. Saccento's medical symptoms as having sweats, severe joint pain, a cough and shortness of breath.

43. Mr. Saccento continued to treat with Summit Medical Group while seeing Dr. DeShaw and the next visit was on December 7, 2021. The issues were the same; that is, chronic Lyme Disease with achiness, fatigue, and brain fog. This visit was with Dr. Cardamone and in the record she stated, "still suffering from brain fog and fatigue. On disability and not able to return to work still because not improving. Doing everything as recommended." That is a definitive statement by a treating physician, and it runs directly counter to the opinion of the paper review physician, Dr. Kretzmann, who found, incredibly, that "…Mr. Saccento does not have any medically necessary restrictions or limitations from any one condition or combination

of conditions from July 10, 2021-forward."

44.     Mr. Saccento continued to treat at Summit and the next visit was on December 27, 2021 with Dr. Zablocki who found the following: "Not feeling any better.  Mood is still good and hopeful.  All joints are painful.  Saw Dr. DeShaw, he ordered MRI brain.  He prescribed clarithromycin and hydroxychloroquine for chronic Lyme.  Following with Dr. Cardamone, PM and doing PT twice weekly.  Taking the duloxetine but not sure it is helping."

45.     The next visit was on January 27, 2022 with Dr. Zablocki, and things were status quo; that is, Mr. Saccento was disabled.  At this point Dr. Zablocki addressed some of the LTD issues and wrote that Mr. Saccento had been under her care since March 1, 2021 and that he is unable to sit or stand for more than 20 minutes at a time and that he for the most part is forced to lie down due to the multiple health issues that he has.

46.     The next visit to Summit was on February 8, 2022 where Mr. Saccento was seen by Dr.  Cardamone.  Dr. Cardamone's note reiterates the same ongoing issues for Mr. Saccento; that is, achiness, fatigue, some relief of his left hip pain following the injection, no improvement with physical therapy, polymyalgia and Chronic Lyme.  She stated that, as on February 8, 2022, Mr. Saccento continued to suffer from brain fog and fatigue and that he is unable to return to work because he is still not improving.

47.     The last visit to Summit that is contained in the Prudential claim file is on February 24. 2022 when he was treated by Dr. Zablocki.  Dr. Zablocki reviews the latest information about Mr. Saccento's conditions.  At this point Mr. Saccento was recovering from Covid and was seeing a Dr. Andrade for homeopathic treatment for his symptoms.  Dr. Zablocki specifically stated that Mr. Saccento's joints were not improved and that the brain and lumbar spine MRIs showed subtle signs of Lyme.  At the end of her note, Dr. Zablocki states that Mr.

Saccento has no improvement in his arthritis and that his disability should continue.

48. On October 25, 2021, Dr. Zablocki filled out Prudential's Capacity Questionnaire concerning Mr. Saccento's capabilities. In that document she estimated that he could go back to work on January 1, 2022. However, that estimation turned out to be incorrect, as Mr. Saccento's health has not improved, and he remains unable to perform the duties of his regular occupation. Also, Prudential's questionnaire asks for certain estimates of a patient's strength. This form is absolutely of no value when determining whether a patient is capable of working, although Prudential pretends otherwise. One example that demonstrates this clearly is the three lines where the doctor is asked if the patient can stand, walk or sit, and, if so, for what percentage of the time in a day. The range which Dr. Zablocki checked off is pre-printed as 1% to 33%. The insurance company wants to say that the doctor has certified that the patient can stand, walk and sit, one third of the time in an eight-hour day; that is, at the 33% level. But in the case of Mr. Saccento, it is known that Dr. Zablocki means that he can only stand, walk and sit for 20 minutes at a time. The rest of the time he must lie down due to fatigue and joint pain. No one can perform any type of employment in this situation.

49. Mr. Saccento's inability to work is further documented in the January 28, 2022 letter from Dr. Zablocki, which unequivocally states that Mr. Saccento is unable to work due to his medical conditions. This is an opinion from a physician who has treated Mr. Saccento for almost a year.

50. In a letter dated June 28, 2022 from Dr. Max DeShaw, the Infectious Disease specialist who has been treating Mr. Saccento since December 1, 2021, he describes and explains in great detail objective medical evidence demonstrating that Mr. Saccento is entitled to long term disability benefits. Dr. DeShaw first describes his qualifications and experience in the area

of treating Lyme Disease and related illnesses and then he reviewed Mr. Saccento's medical history. He next states the current diagnoses for Mr. Saccento which includes Lyme Disease, Babesiosis, etc, and he points out that Mr. Saccento continues to suffer from chronic pain, headaches, fatigue, shortness of breath, cognitive issues and poor ability to focus. All of these issues are consistent with Mr. Saccento's underlying illnesses, and those issues make it impossible for Mr. Saccento to perform his employment duties.

51. Dr. DeShaw explains that "Many patients with Lyme disease that is causing chronic illness may not necessarily text positive by the CDC criteria which requires 5 bands of IgG western blot or 2 bands of igM wester blot." Dr. DeShaw explains that this is the case for Mr. Saccento, and states unequivocally that the "the presence of Babesiosis proves that he was bitten by a Deer Tick." Dr. DeShaw explains:

> **Babesia and Lyme are both organisms that are carried by this vector. Indeed, Babesiosis may have an immune suppressive effect making it difficult for the infected individual to produce antibodies against Lyme, which the test is based upon.**
> **. . . .**
> **Given the above medical scenario it is my opinion that Mr. Saccento is unable to perform his job duties at this time and this will remain so for at least the next year.**

52. Notably, the Policy requires that Mr. Saccento provide Prudential with medical records demonstrating that he is unable to perform the duties of his regular occupation. There is no requirement that the records contain an exact diagnosis of the cause of his disabling conditions. Regardless of the precise diagnosis, the objective medical records irrefutably demonstrate that Mr. Saccento suffers from illnesses causing restrictions and limitations making him unable to perform the duties of his regular occupation.

53. As to the opinions of Dr. Kretzmann, they should be disregarded. Dr. Kretzmann

simply says that he disagrees with Drs. Zablocki, DeShaw and Cardamone even though they have actually met, treated and examined Mr. Saccento on multiple occasions for a year. Dr. Kretzmann simply says that Mr. Saccento is completely well and has zero restrictions or limitations, even in light of the massive amount of evidence to the contrary by numerous physicians who have treated this unfortunate gentleman. Dr. Kretzmann has failed to provide any basis for Prudential to give any weight to his conclusions, and has certainly failed to provide any legally sustainable basis for Prudential to disregard the opinions and records of Mr. Saccento's treating physicians. Accordingly, Prudential must disregard Dr. Kretzmann's report and rely solely upon the records and opinions of Mr. Saccento's treating medical providers.

54.    As is obvious, Mr. Saccento is disabled and unable to work. This man worked for years while being treated and his symptoms simply became worse, year after year, until he finally had so much pain and fatigue that he could not continue working. All of the medical records completely support his disability, and it is arbitrary and capricious to have a paper-review doctor simply disregard all of the evidence and state, in cursory fashion, that this patient's medical records show absolutely no evidence of any medical necessary restrictions and limitations to work.

55.    As demonstrated and proven by the objective medical evidence, Mr. Saccento has been disabled since July 10, 2021, and he continues to be disabled today. Accordingly, Prudential must reverse its decision to pay long term disability benefits to Mr. Saccento.

B.    **Mr. Saccento's Administrative Appeal Demonstrates that he is Disabled:**

56.    ERISA requires plan administrators to maintain "reasonable claims procedures." 29 C.F.R. § 2560.503-1(b).

57.     Upon information and belief, Prudential's claim procedures provide guidance for claims staff in determining whether a claimant is disabled, and those claims procedures are not reasonable.

58.     ERISA requires a plan administrator to provide a "full and fair review" of claims to plan participants, such as Mr. Saccento.  See, 29 U.S.C. § 1133(2).

59.     A "full and fair review" under ERISA requires that "a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits."  29 C.F.R. § 2560.503-1(h)(2)(iii).

60.     The claim file provided by Prudential does not contain any indication that Prudential thoroughly considered or gave adequate weight to object medical evidence of Plaintiff's disabling conditions.

61.     ERISA does not permit Prudential to terminate benefits without a material change in the medical records, and, under these circumstances, to rely upon the opinion of a paper-review doctor over treating physicians.  *Miller v. American Airlines, Inc.,* 632 F.3d 837, 849 (3d Cir. 2011)(citing *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002)(reversal of position supported arbitrary and capricious finding where information used to terminate benefits did "not vary significantly from the [previous] opinions"); *Greene v. Hartford Life and Accident Ins. Co.*, No. 2015 WL 533257, at *3 (E.D. Pa. Feb. 6, 2015)(quoting *Irgon*, 2013 WL 6054809, at *6)(finding that it was arbitrary and capricious to rely upon the opinion of a paper-review doctor over treating physicians where there was no material change in the medical records).

## DEFENDANT'S CONFLICT OF INTEREST

62.     At all relevant times, Defendant has been operating under an inherent and

structural conflict of interest as Defendant is liable for benefit payments due to Plaintiff and each payment depletes Defendant's assets.

63.     Defendant's determination was influenced by its conflict of interest.

64.     Defendant has failed to take active steps to reduce potential bias and to promote accuracy of its benefits determinations.

65.     The long-term disability Plan gave Defendant the right to have Plaintiff submit to a physical examination at the appeal level.

66.     A physical examination, with a full file review, provides an evaluator with more information than a medical file review alone.

67.     More information promotes accurate claims assessment.

68.     Despite having the right to a physical examination, Defendant did not ask Plaintiff to submit to one.

## COUNT I

## WRONGFUL DENIAL OF BENEFITS UNDER, 29 U.S.C. § 1132

69.     The allegations set forth in paragraph 1-68, above, are incorporated as if stated verbatim herein.

70.     An actual controversy exists between Plaintiff and Defendant arising out of the events alleged herein above.  Specifically, Defendant has no legal basis for denying Plaintiff benefits.

71.     Under the terms of the Plan, Defendant agreed to provide Plaintiff with certain disability benefits.

72.     Defendant has failed and refused to pay Plaintiff the benefits to which he is entitled.

73. Plaintiff has satisfied all conditions precedent under the Plan and is thus eligible to receive benefits for Plaintiff has not waived or otherwise relinquished his entitlement to.

74. Denial of benefits to Plaintiff was contrary to and in breach of the terms of the Plan.

75. Plaintiff seeks reimbursement and compensation for any and all benefits he would have received from the inception of coverage, continuing into the future as long as he continues to fulfill the requirements under the Plan.

76. As a direct and proximate result of the aforementioned conduct of the Defendant in failing to pay Plaintiff benefits, he has been damaged in an amount equal to the amount of benefits to which he is entitled under the terms of the Plan plus interest, for a total amount to be determined by the Court.

77. The denial of the benefits is a breach of the Plan and Policy, in utter disregard of the Record and Claim File and unsupported by substantial evidence.

78. The unlawful behavior of Defendant is evidenced by the following:

a) Failing to authorize benefit payments to Plaintiff at a time when they knew that he was entitled to said benefits under the terms of the Plan, in bad faith and contrary to the Plan;

b) Unreasonably withholding payments from Plaintiff knowing his claims for benefits were valid;

c) Unreasonably failing to pay Plaintiff benefits without having any evidence, substantial or otherwise, supporting their decision to deny benefits;

d) Completely disregarding Plaintiff's treating physicians' assessments of his medical conditions and how they restrict and limit him from performing any occupation without any basis for doing so;

e) Selectively highlighting certain factors in medical reports and/or conversations with Plaintiff's treating physician in order to cast a favorable light on its position while ignoring the conclusions of Plaintiff's treating physicians regarding the conditions for which they rendered treatment;

f) Relying on biased, insufficient and inaccurate reports of hired medical reviewers;

g) Improperly attempting to influence the opinion of a hired medical reviewers to support its own, financially advantageous position;

h) Completely disregarding Plaintiff's own statements regarding his medical conditions and how they restrict and limit his from performing any occupation;

i) Engaging in a pattern of procedural irregularities to advance their own personal interests in denying benefits, to the detriment of Plan participants;

j) Improperly refusing to provide information relevant to the denial determination, which they were obligated to provide pursuant to 29 C.F.R. § 2560.503(g), in violation of ERISA;

k) Consistently acting in their own personal interests instead of those of the Plan and its participants;

l) Requiring Plaintiff to provide objective evidence of his medical conditions, in violation of the Policy;

m) Completely disregarding the Social Security Administration's determination that Plaintiff is totally disabled and eligible for benefits;

n) Failing to have Plaintiff's medical records reviewed by an unconflicted medical professional with the requisite training and experience in the fields of medicine involved, in its initial claim determination, in violation of ERISA;

o)      Failing to follow the guidelines of its own claims procedures, in violation of ERISA;

p)      Failing to consider Plaintiff's age in its transferable skills analyses, in violation of the Policy;

q)      Failing to consider length of time that Plaintiff has not worked in its transferable skills analyses, in violation of the Policy;

r)      Relying on inaccurate transferable skills analyses, which were based on flawed, incorrect vocational data and/or information as to Plaintiff's functional capacity; and

s)      Improperly denying Plaintiff benefits without any information that his condition had improved from the time Prudential initially approved his claim.

79.      Prudential is a fiduciary within the meaning of 29 U.S.C. § 1001, et seq., specifically 29 U.S.C. § 1002(21)(a), and is subject to the duties and liabilities set forth in 29 U.S.C. § 1104, § 1105 and § 1109.

80.      The Plan is required to provide Plaintiff a "full and fair review" of the decision denying his claim.

81.      Prudential acted as a fiduciary of the Plan.

82.      Prudential was responsible for providing Plaintiff a full and fair review of his claim.

83.      Prudential's unreasonable conduct, set forth herein, deprived Plaintiff of a full and fair review of his claim.

84.      A "higher than marketplace" quality standard, as set forth in Metropolitan Life Ins. Co. v. Glenn, 128 S. Ct. 2343 (2008), applies to evaluating the actions of Prudential in this case.

85. Prudential was required to discharge its duties "solely in the interests of the participants and beneficiaries of the plan."

86. Prudential violated the higher-than-marketplace standards that ERISA imposes on insurers.

87. Prudential represented to Plaintiff that benefits would be paid if he met the terms and conditions of the Plan, but failed to fulfill its obligation to discharge its duties solely in the interest of Plan participants.

88. Prudential breached its fiduciary duty and abused its discretion by failing to fairly review and reasonably interpret the reports prepared by Plaintiff's treating and examining physicians, failing to follow its own claims procedures, and failing to consider material relevant to Plaintiff's medical condition.

89. Prudential created an artificial reason for denying Plaintiff's disability benefits.

90. Prudential selectively highlighted certain factors in medical reports in order to cast a favorable light on its position while ignoring the conclusions of Plaintiff's treating doctors regarding the conditions for which they rendered treatment.

91. Prudential has financial conflicts of interest with respect to handling, monitoring and eventually denying Plaintiff's disability benefits.

92. Prudential was influenced by its financial conflict of interest, as both the claims administrator of the Plan and the payor of benefits thereunder, when deciding to deny Plaintiff disability benefits.

93. Prudential breached its fiduciary duty to Plaintiff and abused its discretion by placing its financial interests in reducing its expenses and increasing its profitability above Plaintiff's interests under the Plan to receive disability benefits.

94.     Prudential represented to Plaintiff that benefits would be paid if he met the terms and conditions of the Plan, but failed to fulfill its obligation to discharge its duties solely in the interest of Plan participants by: relying upon biased, inaccurate reports of hired medical reviewers; relying on limited and/or incorrect information; and manipulating the medical evidence in the claim.

95.     Contrary to clear, compelling and substantial medical and functional evidence, Prudential wrongfully denied Plaintiff's total disability claim and has wrongfully maintained that denial to this date.

96.     Prudential has been forced to bring the instant action as a direct result of Defendant's unlawful denial and violations of the Plan and ERISA.

97.     As a direct and proximate result of the conduct of the Defendant in failing to pay Plaintiff benefits, Plaintiff has been damaged in an amount equal to the amount of benefits he would have received under the terms of the Plan plus interest, for a total amount to be determined prior to trial.

98.     Prudential is both the administrator and funding source for the Plan.

99.     Prudential was under a perpetual conflict of interest because the benefits would have been paid out of its own funds. Prudential allowed its concern over its own funds to influence decision-making.

## COUNT II
### ATTORNEYS FEES AND COSTS

100.    The allegations set forth in paragraph 1-99, above, are incorporated as if stated verbatim herein.

101.     By reason of Defendant's failure to pay Plaintiff benefits due under the terms of the Plan, Plaintiff has been forced to retain attorneys to recover such benefits, for which Plaintiff has and will continue to incur attorney's fees.  Plaintiff is entitled to recover reasonable attorney's fees and costs of this action, pursuant to, *inter alia*, Section 502(g)(1) of ERISA, 29 U.S.C. §1132(g)(1).

**WHEREFORE,** Plaintiff Kyle A. Saccento demands judgment and the following relief:

A.     Grant Plaintiff declaratory relief finding that he is entitled to recover all; past due long term disability benefits yet unpaid;

B.     Order enforcing Plaintiff's rights under the terms of the Plan;

C.     Order Defendant to pay long term disability benefits retroactive from the date of first eligibility to the present in the monthly amount specified in the Plan and subject to such offsets as permitted by the Plan, plus pre-judgment interest;

D.     Order Defendant to remand claim for future administrative review and continue to make future long term disability benefits in the monthly amount specified in the Plan and subject to such offsets as are permitted in the Plan until such time as Defendant makes an adverse determination of long-term disability consistent with ERISA and Plaintiff's entitlements under the Plan.

E.     Order Defendant to pay for the costs of this action and Plaintiff's attorney's fees pursuant to Section 502(g) of ERISA, 29 U.S.C. 1132(g) and;

F.     Order for such other relief to which Plaintiff may justly be entitled.

**WALKER & HERN, LLC**
*Attorneys at Law*

/s/ J. Brooke Hern
J. Brooke Hern (JH2843)

163 Madison Ave., Suite 220
Morristown, New Jersey 07960
Tel. 908-531-7422
Fax. 888-910-5162

ATTORNEYS FOR PLAINTIFF
Kyle A. Saccento

Dated: December 5, 2023